JOURNAL ENTRY and OPINION
{¶ 1} In April 2001, two-month-old M.W. (we will refer to her as "the child") and her brother, 30-month-old Devin, were removed from the custody of their parents and placed in foster care after x-rays showed that she had numerous bone fractures in different stages of healing in her rib cage, clavicle and legs. Assuming that she had been abused, the county obtained temporary custody of the child and her brother and placed them in foster care. Two weeks later, Devin died as a result of having been shaken by his foster mothers' granddaughter. Further examination of the child showed that she suffered from osteogenesis imperfecta, or "brittle bone" disorder — a genetic disorder characterized by bones that break easily, often from little or no apparent cause. The county removed her to another foster home and eventually sought permanent custody, as relevant here, on grounds that the appellant-father R.W.'s past history of abuse and failure to take steps to correct his abusive behavior made him unsuitable as a parent. Although not seeking custody of the child, the father contested the motion for permanent custody and asked the court to impose a planned permanent living arrangement in which he would retain certain parental rights. The court denied the motion for permanent custody and continued temporary custody. Less than three months later, the county filed a new motion for permanent custody, primarily on grounds that the father had failed to complete counseling for his abusive conduct. The court held another hearing and this time granted the motion. The father appeals.
 I {¶ 2} The father first complains that the court violated his right to confront the witnesses against him when it permitted the guardian ad litem for the child to submit a report one day after the close of trial. That report recommended that the court grant the county's motion for permanent custody. The father maintains that the late filing prevented him from cross-examining the guardian ad litem on various factual allegations in the report; namely, his lack of commitment to the child and his propensity toward violence.
 {¶ 3} We summarily reject the father's Confrontation Clause claims as this court has held that the Confrontation Clause of the United States Constitution only applies in criminal cases and not to cases involving requests for permanent custody. See In re Hitchcock (June 22, 2000), Cuyahoga App. No. 76432.
 {¶ 4} The father also argues that the court violated the express terms of R.C. 2151.414(C), which states that "[a] written report of the guardian ad litem of the child shall be submitted to the court prior to or at the time of the hearing * * *."
 {¶ 5} We have held that "any claim of error arising from the guardian ad litem's failure to file a written report is waived when the argument is not raised in the trial court." In re Cordell (Apr. 2, 1992), Cuyahoga App. Nos. 60049 and 60050; see, also, In re Cooper (Aug. 28, 2001), Cuyahoga App. No. 78848.
 {¶ 6} There is no question that the father did not object to the court's order extending the deadline nor did he attempt to call the guardian ad litem as a witness at trial. The father argues that he raised the same objection in the first proceeding, only to have it overruled by the court. He figured that a second objection would be similarly futile. Regardless what he believed the court would do, the father had the duty to preserve error for appellate review. By failing to object, he is deemed to have waived any error.
 {¶ 7} Moreover, we must acknowledge that the father had the benefit of reading the guardian ad litem's first report. That report gave the guardian's opinion that granting permanent custody to the county would be in the best interests of the children. The guardian ad litem questioned the father's sincerity about his commitment to obtain gainful employment and noted that he told her, "I may never work again." She placed these remarks in the context of a wrongful death suit that the parents had pending against the county at the time. This leads to the conclusion that the father's interest in the child may have been pecuniary only. The report also spoke of the guardian ad litem's concerns about the father's abusive and angry conduct, which led one doctor to make a tentative diagnosis of "impulse control disorder."
 {¶ 8} Knowing all of this, it seems unlikely to us that the facts and circumstances which led to this opinion would have changed in any significant way in the very brief period of time that elapsed between the first and second motions for permanent custody. The father could well have assumed that the guardian ad litem would have continued to take a position adverse to his own interests as there was no evidence to show any change in circumstances in his conduct or behavior. Had it been his intention to call the guardian ad litem as a witness, he could easily have assumed the content of her recommendation for the court; hence, his failure to obtain the report before trial would have been of no moment to him.
 II {¶ 9} The father next complains that the court erred by failing to appoint an independent counsel for the child. He argues that the guardian ad litem did not adequately represent the wishes of the child, who he claims "did not by any account wish to be permanently legally separated from her parents."
 {¶ 10} R.C. 2151.281(B) permits the court to appoint a guardian ad litem to protect the interests of any child who has allegedly been abused or neglected. Ordinarily, this appointment satisfies R.C. 2151.352, which grants a child or the child's parents the right to counsel at all stages of the proceedings under R.C. Chapter 2151 and 2152. The supreme court has stated, however, that a child who is the object of a proceeding to terminate parental rights and has been appointed a guardian ad litem may be entitled to the appointment of independent counsel "in certain circumstances." See In re Williams, 101 Ohio St.3d 398, 2004-Ohio-1500, syllabus. Those circumstances can arise when the guardian ad litem's role to protect the best interests of the child conflicts with the child's interests. Id. at ¶ 18; see, also, Juv.R. 4(C).
 {¶ 11} Because the right to counsel is a personal right, we must consider whether the father has standing to raise on the child's behalf issues relating to the court's failure to appoint the child counsel separate from the guardian ad litem. In the context of custody cases, it has been held that "[a]n appealing party may complain of an error committed against a non-appealing party when the error is prejudicial to the rights of the appellant. When parents and their children who are not in the parents' custody seek the same outcome, e.g., reunification, an error that is prejudicial to the children's interests in that outcome is similarly prejudicial to the parents' interests. Thus, the parents would have standing to raise such an error." In re Moody, Athens App. Nos. 00CA5 and 00CA6, 2001-Ohio-2494, at 10 (internal citations omitted); see, also, Jennings-Harder v. Yarmesch, Cuyahoga App. No. 83984, 2004-Ohio-3960 at ¶ 13.
 {¶ 12} The father says that the child expressed a desire to remain with his parents, but we think that it is a dubious proposition. There is nothing in the record to show that she indicated any choice in the matter. To be sure, the father presented evidence to show that the child had a bond with him and the mother. But the presence of parent/child bonding is not the same thing as making a knowing choice to remain with one parent. Indeed, the guardian ad litem noted in her report that the child did not express any preference between her natural and foster parents. Without that evidence to show that the child's interests were aligned with those of the father, the father fails to establish standing. See In re A.P., Cuyahoga App. No. 83220, 204-Ohio-4080, at ¶ 24.
 {¶ 13} Even had the father established standing to raise the argument on appeal, the same lack of evidence showing the child's desire to remain with her parents would doom the father's right to counsel claims. The right to counsel independent from that of the guardian ad litem arises only when the guardian ad litem's duties to protect the best interests of the child conflict with the desires of the child. For example, in the court of appeals decision in the Williams case, the court of appeals noted, "[t]here was evidence Malcolm had repeatedly maintained he wished to remain with appellant. His behavior regressed and became more aggressive upon his removal in October of 2001. During supervised visitation, Malcolm often did not want to let appellant out of his sight. A strong bond between the children and their mother was not in dispute below." See In re Williams, Geauga App. Nos. 2002-G-2454 and 2002-G-2459, 2002-Ohio-6588 at ¶ 9.
 {¶ 14} Here, the child expressed no such desire to remain with her parents, nor did she display the kind of behavior that would cause the court to conclude that the child had expressed a desire to do so. Indeed, the child could not even speak in full sentences. In short, there was nothing in the record to show that the guardian ad litem's representation somehow conflicted with the interests of the child.
 {¶ 15} And even had the child expressed a desire to remain with her natural parents, the court could have acted within its discretion to question whether the child had the mental capacity to make such a decision. At the time of trial, the child was 29-months-old and, aside from showing that she got along well with her parents during visitations, there was no other evidence to show that she had bonded to them. By contrast, the child at issue in Williams was six years of age and had exhibited behavior which backed up his verbal statements about wanting to remain with his natural parents. We have questioned the ability of children older than the child at issue here to make the kind of decisions required as prerequisite for the appointment of independent counsel. See, e.g., In re K. K.H., Cuyahoga App. No. 83410, 2004-Ohio-4629, at ¶ 9 ("[t]he level of cognitive maturity exhibited by a four-year-old non-developmentally delayed child is not that which would indicate the need for independent legal counsel."); In re G.C. M.C.,
Cuyahoga App. No. 83994, 2004-Ohio-5607 (same). If a child four years of age has questionable maturity to request independent counsel, there can be no doubt that a child only 29-months-old likewise has an even greater lack of necessary maturity. Hence, the court did not err by failing to appoint independent counsel for the child.
 III {¶ 16} The father complains that the court's order granting permanent custody of the child to the county was against the manifest weight of the evidence because the evidence did not support the court's findings that (1) the child could not be placed with the parents within a reasonable period of time because the parents had failed to remedy the conditions that caused the child to be removed from the home and (2) that the father demonstrated a lack of commitment to the child. See R.C. 2151.414(E).
 A {¶ 17} We preface our discussion under these assignments of error by noting that the court could not, contrary to the father's assertions, order a planned permanent living arrangement.
 {¶ 18} Pursuant to R.C. 2151.353(A)(5), the court can order a planned permanent living arrangement if "* * * a public children services agency or private child placing agency requests the court to place the child in a planned permanent living arrangement and if the court finds, by clear and convincing evidence, that a planned permanent living arrangement is in the best interest of the child and that one of the following exists:
 {¶ 19} "(a) The child, because of physical, mental, or psychological problems or needs, is unable to function in a family-like setting and must remain in residential or institutional care.
 {¶ 20} "(b) The parents of the child have significant physical, mental, or psychological problems and are unable to care for the child because of those problems, adoption is not in the best interest of the child, as determined in accordance with division (D) of section 2151.414
[2151.41.4] of the Revised Code, and the child retains a significant and positive relationship with a parent or relative.
 {¶ 21} "(c) The child is sixteen years of age or older, has been counseled on the permanent placement options available to the child, is unwilling to accept or unable to adapt to a permanent placement, and is in an agency program preparing the child for independent living."
 {¶ 22} In In re A.B., Cuyahoga App. No. 83971, 2004-Ohio-5862, we very recently restated our view that a planned permanent living arrangement can only be ordered if the county seeks it first. Because the county did not request a planned permanent living arrangement, the court could not order it. Consequently, the father's arguments that the court erred by refusing to implement a planned permanent living arrangement are irrelevant. See, also, In re K.P., Cuyahoga App. No. 82709, 2004-Ohio-1674.
 {¶ 23} We are aware that prior decisions of this court, and other districts, have held that the court may, sua sponte, impose a planned permanent living arrangement. For example, in In re Cremeans (Mar. 12, 1992), Cuyahoga App. Nos. 61367-61369, the panel cited to former R.C.2151.353(A)(5), and held that notwithstanding statutory language to the contrary, the courts were obliged to liberally construe R.C. Chapter 2151 to effectuate "the care, protection, and mental and physical development of children." The panel therefore held that "* * * the trial court has broad discretion under R.C. 2151.353. The fact that the agency did not request long-term foster care does not thereby limit such discretion." See, also, In re Lane (Feb. 8, 2001), Montgomery App. No. 18467.
 {¶ 24} We believe our current line of cases accurately reflects the meaning of R.C. 2151.353(A)(5), and thus expressly disapprove Cremeans.
It is longstanding law that the interpretation of a statute rests on the legislature's intent. State ex rel. Francis v. Sours (1944),143 Ohio St. 120, 124. The intent of the legislature resides first in the words used in the statute. Provident Bank v. Wood (1973),36 Ohio St.2d 101, 105. If those words are unambiguous, we need go no further. State v. Tuomala, 104 Ohio St.3d 93, 2004-Ohio-93, at ¶ 21.
 {¶ 25} The wording of R.C. 2151.353(A)(5) is so unambiguous that we would be hard-pressed to find a clearer indication of intent. The statute states in no uncertain terms that the court may order a planned permanent living arrangement if (1) the county requests it, (2) that the planned permanent living arrangement would be in the best interests of the child, and (3) one of the factors in subsections (A)(5)(a)-(c) exist. While we understand that the best interests of the child are paramount in any custody case and that we are to liberally interpret the statutes to provide for the care and protection of the child, R.C. 2151.01(A), we cannot override unambiguous statutory language. Indeed, the juvenile courts derive their jurisdiction solely by grant from the General Assembly; thus, they do not have inherent equitable jurisdiction to determine a child's best interests. See In re Gibson (1991),61 Ohio St.3d 168, 172. We therefore restate the law in this district to be that a court may not order a planned permanent living arrangement unless it is requested by a "public children services agency or private child placing agency."
 B
A claim that a factual finding is against the manifest weight of the evidence requires us to examine the evidence and determine whether the trial of fact clearly lost its way. We undertake this duty with the presumption that the court's factual findings were correct. See SeasonsCoal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 79-80. This is because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. Hence, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. Morris Co. v. FoleyConstr. Co. (1978), 54 Ohio St.2d 279, syllabus.
 {¶ 26} The court could only grant the motion for permanent custody if it found the factors in R.C. 2151.414(E) existed by clear and convincing evidence. "Clear and convincing evidence" is that quantum of evidence which instills in the trier of fact a firm belief or conviction as to the allegations sought to be established. Cross v. Ledford (1954),161 Ohio St. 469, 477. Our review of the weight of the evidence in a permanent custody case is limited to whether competent, credible evidence exists to support the trial court's factual determinations. In reStarkey, 150 Ohio App.3d 612, 2002-Ohio-6892, at ¶ 16.
 C {¶ 27} R.C. 2151.414(B)(1) states that before a court can grant permanent custody to a moving agency, it must determine, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply: (a) the child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period ending on or after March 18, 1999.
 {¶ 28} There is no factual dispute as to the court's finding that the child had been in the county's custody for 12 or more months of a consecutive 22-month period ending after March 18, 1999. The county took custody of the child on April 4, 2001, and she has continually remained in the county's custody since that time. That being the case, the court had no obligation to determine whether the child cannot or should not be placed with either parent within a reasonable time. See In re M.H.,
Cuyahoga App. No. 80620, 2002-Ohio-2968, at ¶ 25. The sole consideration at this point is whether permanent custody was in the best interests of the child. In re R.K., Cuyahoga App. No. 82374, 2003-Ohio-6333, at ¶ 16.
 {¶ 29} Because the father was unwilling to take custody of the child and the option of a planned permanent living arrangement was unavailable due to the county's failure to request it, the issue becomes whether permanent custody was in the best interests of the child. R.C. 2151.414(D) gives a nonexclusive list of factors which the court shall consider when determining the best interests of a child:
 {¶ 30} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers (sic) and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 31} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 32} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period ending on or after March 18, 1999;
 {¶ 33} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 34} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." {¶ 35} Only one of the enumerated factors needs to be present in order for the court to award permanent custody. In re C.H., Cuyahoga App. Nos. 82258 and 82852, 2003-Ohio-6854, at ¶ 34.
 {¶ 36} The court made several conclusions of law, some of which specifically referenced factors listed under R.C. 2151.414(D). Contrary to the county's assertions, however, the court did not issue a conclusion of law specifically finding that permanent custody would be in the child's best interests because she had been in the temporary custody of the county for 12 or more months of a consecutive 22-month period. Had the court made a specific reference to this finding, our inquiry would be at an end. But the factor is not self-executing. It nonetheless requires that a concomitant finding relating to the best interests of the child be made. Even though the child has been in the temporary custody of the county for 12 or more months of a consecutive 22-month period, the court may still find that permanent custody would not be in the child's best interests.
 {¶ 37} One factor that the court did list as going to the child's best interests was the need of a legally secure placement that could not be achieved without a grant of permanent custody. The court ruled that as the child matures, "while enduring a physically challenging condition, she will need a secure, mature, family environment that is attentive to and supportive of her needs."
 {¶ 38} As we previously noted, the father did not seek custody of the child nor did the county want a planned permanent living arrangement. With no other dispositional option available to it, the court had no choice but to order permanent custody as the sole remaining avenue for creating a legally secure placement. The evidence supported the court's findings.
 IV {¶ 39} In April 2003, the trial judge informed the parties that she attended a party in December 2002 and met the child and foster mother. The court told the parties that "she's a very lovely child." None of the parties voiced any concerns about the judge's comments. Just before the start of the foster mothers' testimony, the trial judge reiterated for the record that she met the child and foster mother at a party. She said that she spoke briefly to the foster mother and told her that she thought the child was "lovely." The judge characterized the conversation as "small talk" and said it lasted about five minutes. The judge went on to assure the parties that this brief interaction would not affect her judgment, but that she wanted the parties to know about it. The father did not object.
 {¶ 40} The father's lack of objection to the court's disclosure forecloses his ability to complain about it on appeal. Had he wished for the court to recuse itself, he should have made a motion at a time when the court could have acted in a timely manner. By failing to do so, he is deemed to have waived the argument on appeal. State v. Williams (1977),51 Ohio St.2d 112, paragraph two of the syllabus
 {¶ 41} In any event, we see no likelihood whatsoever that the court's brief interaction with the child was sufficient to call its impartiality into question. Canon 3(B)(7) of the Code of Judicial Conduct states that "[a] judge shall not initiate, receive, permit or consider communications made to the judge outside the presence of the parties or their representatives concerning a pending or impending * * *" unless certain inapplicable exceptions apply. The "communications" in this case were non-substantive, and clearly so innocuous that the father saw no reason to ask the court to recuse itself. While the better course is for a trial judge to avoid all contact with parties to a case, we find that the contact here was harmless beyond any doubt since it was non-substantive. See State v. Jenkins (1984), 15 Ohio St.3d 164 (non-substantive ex parte communication between judge and jury held harmless).
 V {¶ 42} The father next complains of several instances in which he claims his assigned counsel performed ineffectively. He maintains that counsel should have filed objections to the unattainable case plan goals, that counsel should have requested the appointment of a new guardian ad litem for the child, and that counsel should have asked the judge to recuse herself once she revealed that she had an out-of-court conversation with the foster mother.
 A {¶ 43} "In actions instituted by the state to force the permanent, involuntary termination of parental rights, the United States and Ohio Constitutions' guarantees of due process and equal protection of the law require that indigent parents be provided with counsel and a transcript at public expense for appeals as of right." State ex rel. Heller v.Miller (1980), 61 Ohio St.2d 6, paragraph two of the syllabus; see, also, R.C. 2151.352 (statutory right to representation by legal counsel at all stages of proceedings under R.C. Chapter 2151). We thus consider claims of ineffective assistance of counsel in proceedings to terminate parental rights under the two-part test set forth in Strickland v.Washington (1984), 466 U.S. 668. That test means that the party claiming ineffective assistance of counsel must show that counsel's performance was deficient and that the deficient performance was so serious as to prejudice the defense. We have no obligation to address the separate elements of an ineffective assistance of counsel claim in any order: "there is no reason for a court * * * to approach the inquiry in the same order or even to address both components of the inquiry if the [party asserting the claim] makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Id. at 697.
 B {¶ 44} The father first maintains that counsel should have made a timely objection to two items contained in the case plan. First, he argues that the lack of competent evidence showing a history of domestic violence made it inevitable that his protestations of innocence would cause him to be removed from treatment. Second, he maintains that the requirement that he and the mother live apart for six months could not be completed because the mother could find no housing other than in a battered woman's shelter and eventually had no choice but to return to live with him. Counsel orally objected to these elements of the case plan, but the court said that it would not rule on them since the objections had not been "formally submitted."
 {¶ 45} While counsel had the obligation to formally object to the case plan and request a hearing, see R.C. 2151.412(E)(2), we cannot say that counsel acted deficiently by failing to do so. The county continued to believe that the father had issues relating to anger management and impulse control. Although the father repeatedly denied having anger issues, those denials simply reinforced for the county the depth of his problems. While the father makes a compelling argument to show that he had no such issues, it is highly unlikely that the court would have amended the case plan based on the father's assertions to the contrary. In fact, the father only argues that a timely objection "may have" caused the court to modify the case plan. To prevail on an ineffective assistance of counsel argument, the father needs to show that but for the error the result of the proceeding would have been different. Here, he has only stated that it is possible that the outcome would have been different, and that is not enough. State v. Bradley (1989), 42 Ohio St.3d 136, paragraph three of the syllabus.
 {¶ 46} As for the requirement that the couple live separate and apart for six months, we see no prejudice from the failure to object in a timely manner because the court did not specifically note this as a finding of fact in its order.
 C {¶ 47} The father argues that counsel should have requested the appointment of an independent counsel for the child once it became clear that the guardian ad litem did not provide representation consistent with the child's wishes to be reunited with her natural parents. As we stated earlier, the child was far too young to express any choice in custody, and counsel would have had to make a spurious argument to carry out the father's wishes. Counsel did not act deficiently by failing to make such an argument.
 D {¶ 48} Although counsel did not ask the judge to recuse herself after disclosing that she had briefly spoken to the foster mother at a party, that failure to act did not amount to a breach of an essential duty. The judge appeared to fully disclose the length and content of her interaction with the foster mother and child, and there was no indication whatsoever that her interaction with the foster mother and child somehow affected her decision in this matter. Indeed, we would assume that counsel would have wanted the judge to continue presiding over the matter since she had ruled favorably for the father in the first permanent custody hearing. That prior ruling, coming as it did after the judge disclosed the brief conversation with all the parties, would seem to be proof positive that the judge had not been biased against the father.
 VI {¶ 49} The father next complains that the court's journal entry granting permanent custody failed to demonstrate that the court considered all the factors required by R.C. 2151.414(D), particularly the child's relationship with her parents and the child's wishes with regard to custody.
 {¶ 50} R.C. 2151.414(D) requires the court to "consider all relevant factors, including, but not limited to" factors set forth within that section. In In re I.M., Cuyahoga App. Nos. 82669 82695, 2003-Ohio-7069, we stated at ¶ 27:
 {¶ 51} "R.C. 2151.414(D) requires the court to `consider all relevant factors' as set forth in this subsection. R.C. 2151.414(E), on the other hand, requires that the court `consider all relevant evidence' before determining that one or more of the conditions exist as set forth in this subsection before it enters a finding that the child cannot be placed with either parent. The statute does not require the court to list those factors or conditions it found applicable before making its determination that the child cannot be placed with either parent or that the permanent custody is in that child's best interest. * * * Absent [a request for findings of fact] and as long as the record supports the court's decision, the trial court was not required to journalize an entry that demonstrates that it considered statutory factors or evidence to support those factors before making a finding that the child could not be placed with either parent and that permanent custody is in the child's best interest."
 {¶ 52} The court did issue findings of fact which directly addressed several of the factors listed under R.C. 2151.414(D). As relevant here, the court found that "the child has visited with her parents while in foster care. There is nothing to indicate that visitation of some form could not continue if permanent custody is granted. While the child relates well to her biological parents, she has a significant attachment to her foster family." This statement certainly indicated that the court considered "the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers (sic) and out-of-home providers, and any other person who may significantly affect the child." See R.C. 2151.414(D)(1).
 {¶ 53} The court concluded that the parents had a relationship with the child, but that the foster parents had a greater relationship. The court found that the foster parents were "attentive, nurturing, and loving in their care of the child." On the other hand, the court found that "the parents' problems, especially those of the mother, eclipse those of the child. * * * A child * * * cannot afford to be in an environment of inattention and self-absorption on the part of the parent or caregiver [sic.])."
 {¶ 54} Moreover, the court found that the parents had shown a "lack of commitment" toward the child by "failing to regularly support, visit or communicate with the child." This lack of commitment directly relates to "interaction and interrelationship" between parents and child as required by R.C. 2151.414(A)(1). By failing to maintain a consistent schedule of visitation, the parents could not help but undermine their relationship with the child.
 {¶ 55} The court did not make any findings directly related to the child's wishes, but under the circumstances, it did not need to. As we found in part II of this opinion, the 29-month-old child did not have mental capacity to express her wishes on the matter. We cannot fault the court for ignoring an otherwise inapplicable factor.
 VII {¶ 56} During the first permanent custody hearing, the court heard the testimony of a doctor who examined the mother as a result of complaints she made that the father had partially mutilated her genitalia while performing oral sex on her. The doctor's examination could not verify the mother's complaints, and his office notes show that he believed she might have fabricated the allegations. The doctor testified over the mother's objections that he was violating the doctor/patient privilege. The court eventually struck the doctor's testimony, but allowed his report into evidence. The mother did not appeal. At the second hearing, the court incorporated all exhibits admitted into evidence at the first trial, including the doctor's notes. The father now complains that the court erred by doing so since the report constituted unauthenticated hearsay.
 {¶ 57} We review this assignment of error under the invited error standard because the father himself requested the court to consider the evidence even after the court said that it "would allow you to make any objections if you want to convince me that I should not consider the findings that I made in the past."
 {¶ 58} "The doctrine of invited error holds that a litigant may not take advantage of an error which he himself invited or induced." Statev. Campbell (2000), 90 Ohio St.3d 320, 324, 2000-Ohio-183 (internal quotation marks and citation omitted). The father's attorney said that he would post a "general objection" to the extent that the court failed to take into consideration "all of the evidence that is presented both at these proceedings and prior proceedings." By specifically asking the court to consider evidence admitted from the first hearing, the father is precluded from arguing that its admission, as requested, was erroneous.
Judgment affirmed.
It is ordered that appellee recover of appellant their costs herein taxed.
The court finds there were reasonable grounds for this appeal. It is ordered that a special mandate issue out of this court directing the Common Pleas Court — Juvenile Court Division to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Sweeney, P.J., Concurs.
 Karpinski, J., Concurs in Judgment Only.